UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------X
JOSE BLANCO BONILLA,

                 Plaintiff,

                                    MEMORANDUM & ORDER
       -against-                   20-CV-0655 (JS)

COMMISSIONER OF SOCIAL SECURITY,

                 Defendant.
---------------------------------------X
APPEARANCES
For Plaintiff:       Jonathan R. Klee, Esq.
                       Klee, Woolf, Goldman & Filpi, L.L.P.
                       350 Willis Avenue
                       Mineola, New York 11501

For Defendant:       Anne M. Zeigler, Esq.
                       United States Attorney's Office
                       Eastern District of New York
                       271 Cadman Plaza East
                       Brooklyn, New York 11201

SEYBERT, District Judge:

        Plaintiff Jose Blanco Bonilla ("Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the denial of his application for Social Security Disability Insurance Benefits by the Commissioner of Social Security (the "Commissioner"). (Compl., ECF No. 1, ¶¶ 1-2.) Presently pending before the Court are the parties' cross-motions for judgment on the pleadings. For the following reasons, Plaintiff's motion (ECF No. 13.) is DENIED, and the Commissioner's motion (ECF No. 15) is GRANTED.

BACKGROUND[1]

I.   Procedural History

On October 26, 2016, Plaintiff completed an application for disability insurance benefits alleging disability as of January 20, 2015 due to impairments to his neck, lower back, and bilateral shoulders, as well as numbness of the hands and fingers. (R. 165-66, 178.)  After Plaintiff's claim was denied (R. 80-91), he requested a hearing before an Administrative Law Judge ("ALJ") (R. 92-98).  On October 10, 2018, Plaintiff, accompanied by a representative, appeared for a hearing before ALJ Susan G. Smith (the "Hearing").  (R. 14-33.)  James Prim, a vocational expert, also testified at the Hearing.  (R. 50-52.)

In a decision dated December 3, 2018, the ALJ found that Plaintiff was not disabled.  (R. 20-28.)  On December 16, 2019, the Social Security Administration's Appeals Council denied Plaintiff's request for review, and the ALJ's decision became the final decision of the Commissioner.  (R. 1-4.)

Plaintiff initiated this action on February 5, 2020 (see Compl.) and moved for judgment on the pleadings on September 21,

_____

[1] The background is derived from the administrative record filed by the Commissioner on February 9, 2018.  (See ECF No. 12.)  For purposes of this Memorandum and Order, familiarity with the administrative record is presumed.  The Court's discussion of the evidence is limited to the challenges and responses raised in the parties' briefs.  Hereafter, the administrative record will be denoted "R.".

2020 (Pl. Mot., ECF No. 13; Pl. Br., ECF No. 14.).  On November
20, 2020, the Commissioner filed a cross-motion for judgment on
the pleadings (Comm'r Mot., ECF No. 15.), and on December 8, 2020,
Plaintiff filed his reply (Reply, ECF No. 16).

II.  Evidence Presented to the ALJ

The Court first summarizes Plaintiff's testimonial
evidence and employment history before turning to Plaintiff's
medical records and the vocational expert's testimony.

A.  Testimonial Evidence and Employment History

Plaintiff was born in El Salvador in 1974.  (R. 165.)
He completed his schooling there, reaching twelfth grade.  He moved
to the United States in 1996 at the age of twenty-two.  (R. 39-
40.)  At the time of the October 10, 2018 hearing, Plaintiff was
forty-four years old and lived with his wife and two sons.  (R. 38-
39.)  Plaintiff can read and understand basic English, though his
language skills are limited.  (R. 38-41.)

Plaintiff testified that he had been unable to work since
January 20, 2015 due to a work-related incident that caused injury
to his neck, lower back, and bilateral shoulders.  (R. 41-42, 46-
47.)  Prior to his injury, for which he received worker's
compensation benefits (R. 152-64), Plaintiff worked as a salvage
laborer, asphalt laborer, truck driver, and tree cutter (R. 199-
204).  According to Plaintiff, after his injury, he underwent
bilateral shoulder surgeries but still experienced pain, primarily

to his left shoulder.  (R. 48.)  He further testified that he was indicated for neck surgery but was not willing to pursue it given his doctor's prognosis that it may not improve his condition. (R. 46-47.)

With respect to his limitations, Plaintiff testified that he could not use his arms for more than five minutes without getting "tired."  (R. 42.)  Plaintiff testified he could lift twenty pounds with his right hand and ten pounds with his left hand.  (R. 45.)  He further testified that he could sit for about twenty minutes before his body "gets kind of numb" and could stand for twenty to thirty minutes at a time before experiencing neck pain.  (R. 44.)  According to Plaintiff, he could walk about four blocks before needing a break.  (R. 45.)  Moreover, he experiences pain and stiffness to the lower back with bending and squatting, as well as difficulty reaching with the left upper extremity due to pain and weakness.  (R. 45-46.)  Plaintiff stated that he had difficulty using his hands to handle small change or tie his shoes, testifying that "[i]t is like my fingers are stuck . . . they don't even move."  (R. 46.)  Plaintiff cannot drive for more than one hour at a time.  (R. 47.)

Plaintiff testified that, on a typical day, he takes his children to school in the morning and then returns home to ice his arms and back.  (R. 42.)  He takes Tylenol for the pain.  (R. 42.) He further testified that since his injury he no longer mows the

lawn, performs housework such as cooking or cleaning, or changes lightbulbs.  (R. 42-43.)  Plaintiff testified that he would attend Mass twice per week, though he has difficulties kneeling for an extended period.  (R. 42-43.)  According to Plaintiff, he typically goes to sleep around 9:00 or 10:00 p.m. but experiences difficulties falling asleep at times due to the pain and numbness in his arms.  (R. 43.)  To compensate for this lack of sleep, he would take naps in the afternoon.  (R. 44.)

    B.   <u>Medical Evidence</u>

Immediately after sustaining a fall at work on January 20, 2015, Plaintiff sought treatment at Plainview Hospital.  He reported injuries to his left shoulder and lower back and rated his pain 9-out-of-10.  (R. 247-69.)  He had limited range of motion in the left shoulder, which showed signs of swelling, but no restriction of movement or tenderness for his back.  (R. 261, 266.)  X-rays of the lumbar spine and left shoulder showed no abnormality or acute fracture.  (R 251-52.)  Plaintiff was diagnosed with back and left shoulder pain and prescribed Motrin 600mg.  (R. 249-50.)

In February 2015, Plaintiff initiated treatment with Dr. Amit Sharma ("Dr. Sharma") for paracervical pain, bilateral shoulder pain, and lower back pain.  (R. 701.)  He complained of paresthesias and a cold-like sensation in both arms and posterior thighs up to his knees but denied any weakness in his arms or legs.  (R. 701.)  He also rated his pain 8-out-of-10 and noted that it

was aggravated with standing, sitting, and walking.  (R. 701.)  On examination, Plaintiff had limited ranges of motion in his neck, back, and shoulders.  (R. 702.)  Dr. Sharma diagnosed Plaintiff with cervicalgia, lumbago, and shoulder pain.  (R. 702.)  A subsequent 2015 MRI of Plaintiff's right shoulder showed an intact rotator cuff and a labrum tear (R. 904), and an MRI of Plaintiff's cervical spine showed degenerative changes with disc herniation and minimal cord flattening at C3-4 and C4-5 (R. 905).  Dr. Sharma consistently opined that these "imaging studies are relatively benign."  (R. 675, 677, 682, 684.)  Due to continued pain, Plaintiff received a lumbar injection in March 2015, which provided "moderate improvement in his pain."  (R. 691.)

At follow-up appointments with Dr. Sharma, Plaintiff reported ongoing neck and lower back pain with radiation to both shoulders, as well as intermittent paresthesias of both hands. (R. 691-92.)  His neck pain progressively deteriorated over the summer of 2015.  (R. 693.)  Plaintiff received a cervical branch block in August 2015 (R. 707-08), a second lumbar injection in September 2015 (R. 705), and a cervical injection in December 2015 (R. 703).  Plaintiff's physical examinations throughout 2015 showed reduced ranges of motion of the neck, lower back, and bilateral shoulders, intact sensation and motor function, normal gait, and 5/5 strength in the upper and lower extremities. (R. 688-700.)

After his workplace accident, Plaintiff also sought chiropractic care from Dr. Jamie Skurka ("Dr. Skurka").  (See generally R. 436-76.)  On initial examination, Dr. Skurka found decreased cervical range of motion, decreased strength of the upper extremities with finger adduction, and cervical paraspinal muscle spasms, among other conditions. (R. 436-38.)  Dr. Skurka diagnosed cervical strain, lumbosacral sprain, lumbar facet syndrome, lumbar radiculitis, myofascial pain syndrome, and spinal joint dysfunction of the cervical, lumbar, and thoracic spines.  (R. 436-38.)  Plaintiff continued to present for chiropractic treatment through September 2016, reporting ongoing neck and lower back pain with numbness and paresthesias.  (R. 455-78.)

On June 3, 2015, Plaintiff presented to Dr. Anthony Cappellino ("Dr. Cappellino") with complaints of ongoing and worsening bilateral shoulder pain, neck pain, and lower back pain, which failed to improve with physical therapy.  (R. 609; see also R. 270-71, 317-431 (physical therapy records).)  Dr. Cappellino examined Plaintiff's right shoulder and diagnosed shoulder pain, rotator cuff tendinitis and subacromial impingement, shoulder sprain, and rotator cuff sprain.  (R. 609-13.)  He recommended a right shoulder arthroscopy, which recommendation he reiterated at a July 15, 2015 visit, and prescribed Duexis 800mg.  (R. 611.)  At an August 27, 2015 visit to Dr. Cappellino, Plaintiff further complained of paresthesias in both hands.  (R. 619.)  At that

visit, Dr. Cappellino also noted that Plaintiff exhibited worsened Hawkin's and Neer's signs of the left upper extremity, worsened acromioclavicular joint tenderness of the left shoulder, decreased left shoulder range of motion, and worsened pain with apprehension testing on the left, among other negative findings.  (R. 621.) Plaintiff was diagnosed with shoulder pain, rotator cuff tendinitis and subacromial impingement, and joint derangement of the shoulder.  (R. 621.)  These findings were reiterated by Dr. Cappellino in October and November 2015, except that Plaintiff denied paresthesias at the October visit.  (R. 624-37.)

Plaintiff returned to Dr. Cappellino on December 15, 2015 and was indicated for right shoulder surgery.  (R. 634-38.) Thereafter, on February 22, 2016, Plaintiff underwent right shoulder arthroscopy with labral repair, anterior acromioplasty, and debridement.  (R. 604-06.)  At his post-operative visit on March 1, 2016, Plaintiff reported ongoing right shoulder pain. (R. 644; see also R. 653 (Dr. Cappellino's notes from April 7, 2016 visit observing moderate right shoulder pain).)  Plaintiff continued to take Duexis and started physical therapy where he made "steady progress" but still experienced "some issues." (E.g., R. 657 (Dr. Cappellino's notes from May 19, 2016 visit).)  At a May 19, 2016 visit, Dr. Cappellino diagnosed Plaintiff with right shoulder instability, sprain of the right rotator cuff, cervicalgia, and cervical radiculopathy.  (R. 659.)  These

findings remained the same at his visit in June 2016. (R. 662-66.)

By July 2016, Plaintiff reported to Dr. Cappellino that his right shoulder was doing better, though he complained of "some weakness to the right arm" and "increasing neck and lower back issues." (R. 667.) He also denied any paresthesias numbness or tingling distally. (R. 667.) Dr. Cappellino's diagnosis remained unchanged. (R. 669.) In September 2016 Dr. Cappellino continued to report that Plaintiff was "doing better with the right shoulder," but also noted that Plaintiff experienced "some stiffness and tightness and some occasional discomfort anteriorly," as well as "increasing pain on the left in both the anterior aspect of the joint and in the upper arm area," which had "been worsening over the past few weeks." (R. 672.) Plaintiff reported "having some difficulties reaching behind the back and with overhead maneuvers" and with pushing and pulling. (R. 672.) Dr. Cappellino reported similar findings in October 2016. (R. 589.) At these fall 2016 visits to Dr. Cappellino, examinations revealed Plaintiff had normal strength in his wrists, hands, biceps, and triceps, and normal reflexes in his biceps and triceps. (R. 733, 736, 738.)

Meanwhile, Plaintiff continued pain management with Dr. Sharma. (R. 677-85, 748-50.) At a physical examination on August 17, 2016, Dr. Sharma found Plaintiff continued to have limited

range of motion of the neck, lower back, and bilateral shoulders, and diagnosed him with cervical degenerative disc disease, lumbar herniated disc, and lumbar radiculitis versus radiculopathy. (R. 677-78.)  She recommended Plaintiff avoid all steroids due to the development of adverse side-effects from his prior epidural steroid injection.  (R. 678.)  These findings remained unchanged through October 2016.  (R. 675-76.)

Beginning in September 2016, Plaintiff presented to Dr. Maria Herrera ("Dr. Herrera") with complaints of neck pain radiating to both shoulders and upper extremities; bilateral hand paresthesias; bilateral lower extremity paresthesias; lower back pain with radiation to the lower extremities that worsened by bending, lifting, prolonged sitting, moving from the prone to standing position, and prolonged walking; and bilateral shoulder pain.  (R. 712.)  Based on her examination findings, Dr. Herrera diagnosed cervicalgia, cervical disc disorder, impingement syndrome of the shoulders, and injury to the glenoid labrum of the shoulder.  (R. 714.)  Dr. Herrera recommended that Plaintiff avoid prolonged sitting, standing, and walking, overhead activities, and lifting more than ten pounds.  (R. 714.)  Thereafter, Dr. Herrera performed acupuncture to the spine from September 6, 2016 through October 20, 2016 for a total of twelve sessions.  (R. 716-29.)  Plaintiff's neck pain reportedly "improved."  (R. 732, 740.)  On re-evaluation by Dr. Herrera on October 27, 2016, Plaintiff

reported similar conditions, except he noted some improvement in bilateral hand paresthesias.  (R. 732.)  Dr. Herrera recommended a course of physical therapy for Plaintiff's back, shoulder, and neck pain.

On February 22, 2017, Plaintiff underwent left shoulder arthroscopy with anterior labral repair, anterior acromioplasty, and debridement of partial thickness rotator cuff tear.  (R. 752.) Plaintiff returned to Dr. Cappellino for a post-operative visit on March 1, 2017, complaining of continued left shoulder pain. (R. 760.)  Dr. Cappellino prescribed Oxycodone-Acetaminophen 5-325mg and Duexis 800mg.  (R. 853.)  Although Plaintiff reported improvement in his left shoulder at an April 27, 2017 visit to Dr. Cappellino (R. 849), he reported worsening pain at a subsequent visit on May 18, 2017 (R. 853).  Plaintiff further complained of right shoulder pain due to overuse.  (R. 853.)  Nevertheless, at these visits Dr. Cappellino's physical examinations revealed normal deltoid strength, normal internal rotation strength, and diminished external rotation strength bilaterally.  (R. 855, 859.) Plaintiff received cortisone injections to his right shoulder, and Dr. Cappellino recommended Plaintiff continue physical therapy. (R. 856.)  Plaintiff attended physical therapy from May 1, 2017 through May 31, 2017.  (R. 776-83.)  According to Dr. Cappellino's treatment notes from the fall of 2017, Plaintiff "show[ed] signs of significant improvement in his range of motion with physical

therapy," though he continued to experience pain at night that woke him at times. (E.g., R. 867, 869.) Plaintiff also denied paresthesia around this time. (E.g., R. 872 (November 22, 2017 treatment notes); 875 (January 18, 2018 treatment notes).)

Plaintiff continued to see Dr. Herrera for treatment in late 2017 and early 2018. Findings from Dr. Herrera's physical examinations remained unchanged, as did her recommendation that Plaintiff avoid lifting more than ten pounds, reaching overhead, and frequent bending. (R. 815-20.) Significantly, however, Dr. Herrera's assessments from this period did not contain any sitting restrictions. (E.g., R. 813, 817, 819, 828.) Plaintiff received multiple sessions of acupuncture in December 2017 and January 2018 (R. 821-26), which reportedly provided some pain relief, though Plaintiff continued to report bilateral shoulder, neck, and lower back symptoms. (R. 827-30.) Plaintiff reported some diminishment in pain following trigger point injections in the neck and shoulders. (R. 837.) On March 12, 2018, Plaintiff underwent a nerve conduction study and an EMG study, which showed "mild bilateral C5, C6 cervical radiculopathy." (R. 798.)

In July 2018, Plaintiff presented to Dr. Zachariah M. George ("Dr. George") for a neurosurgical evaluation, during which he reported significant neck pain with radiating arm pain and pain to bilateral thumbs. (R. 901.) Dr. George recommended cervical

fusion given Plaintiff's lack of response to conservative treatment.  (R. 901.)

C.  Opinion Evidence

In April 2015, Plaintiff presented to Dr. Robert Moriarty ("Dr. Moriarty") for an independent medical examination for purposes of his worker's compensation claim.  At the time, Plaintiff reported bilateral shoulder, left hand, and lower back injuries from his recent work-related accident.  (R. 301.)  After examining Plaintiff, Dr. Moriarty diagnosed him with bilateral shoulder sprain/strain (left greater than right), left hand sprain/strain, and lumbar sprain/strain.  (R. 303.)  Plaintiff was deemed capable of working in a modified duty capacity with weight restrictions of fifteen pounds, inability to use the hand for overhead work, and inability to climb trees or ladders.  (R. 304.)  Plaintiff visited Dr. Moriarty for follow-up examinations on November 2, 2015 and May 25, 2016, where his examination findings, diagnosis, and limitations were similar.  (R. 312-16, 306-11.)

D.  Vocational Expert's Testimony

At the Hearing, the vocational expert ("VE") testified that Plaintiff had worked as a truck driver, which required medium exertion; tree cutter, which required heavy exertion; asphalt laborer, which required very heavy exertion; general laborer, which required very heavy exertion; and salvage laborer, which required medium exertion.  (R. 50.)  When asked to consider a

hypothetical individual with Plaintiff's vocational profile and residual functional capacity, discussed <u>infra</u>, the VE testified that such an individual would not be capable of performing any of his past work but would be capable of performing other work, such as the representative occupations of a document preparation clerk, order clerk, or call out operator. (R. 50-51.) When the ALJ added limitations of only occasional overhead lifting bilaterally and only occasional pushing and pulling with both upper extremities, the VE indicated that Plaintiff would still be capable of performing the aforementioned occupations. (R. 51-52.) However, when the ALJ added an additional limitation, namely, only occasional reaching in all directions with the bilateral upper extremities and only occasional use of the hands for bilateral handling and fingering, the VE testified that such limitations would preclude all work at the sedentary level of exertion. (R. 52.)

DISCUSSION

I.   <u>Standard of Review</u>

In reviewing the ruling of an ALJ, the Court does not determine <u>de novo</u> whether the plaintiff is entitled to disability benefits. Thus, even if the Court may have reached a different decision, it must not substitute its own judgment for that of the ALJ. <u>See</u> <u>Colgan v. Kijakazi</u>, No. 20-CV-3297, 2022 WL 18502, at *3 (2d Cir. Jan. 3, 2022); <u>see also</u> <u>Jones v. Sullivan</u>, 949 F.2d 57,

14

59 (2d Cir. 1991).  Put otherwise "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982)).

II.   The ALJ's Decision

Initially, the ALJ found that Plaintiff meets the insured-status requirements of his claim through December 31, 2020. (R. 22.)  Next, the ALJ applied the familiar five-step disability analysis and concluded that Plaintiff was not disabled from January 20, 2015, the alleged disability-onset date, through December 3, 2018, the date of the decision.  (R. 20-28); see also 20 C.F.R. § 404.1520.  At steps one through three, the ALJ found that (1) Plaintiff had not engaged in substantial gainful activity since the alleged onset date (R. 22); (2) Plaintiff had severe impairments consisting of right shoulder anterior labral tear, left shoulder anterior labral tear, cervical radiculopathy, and degenerative disc disease (R. 22); and (3) Plaintiff's impairments did not meet or medically equal the severity of any of the impairments listed in Appendix 1 of the Social Security regulations (R. 22-23).

The ALJ then determined that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work, albeit with

certain limitations.  (R. 23); see also 20 C.F.R. § 404.1567(a).
Specifically, the ALJ identified the following limitations:
Plaintiff could occasionally climb stairs/ramps, balance, stoop,
kneel, crouch, and crawl; never climb ladders, ropes, and
scaffolds; Plaintiff must avoid concentrated exposure to hazards
including dangerous moving machinery, uneven terrain, and
unprotected heights; and Plaintiff could occasionally reach
overhead bilaterally and push and pull with the upper extremities
bilaterally.  (R. 23.)

     To support her RFC determination, the ALJ first
summarized Plaintiff's hearing testimony.  (R. 23.)  The ALJ:
observed that Plaintiff testified he experienced pain in his neck,
shoulders, and back since suffering an injury at work; discussed
Plaintiff's testimony that his symptoms limited his ability to
stand, walk, sit, lift, and reach overhead bilaterally, and that
he reported he could lift no more than ten pounds, and walk for
approximately fifteen minutes before needing a break; and noted
Plaintiff's testimony regarding his "activities of daily living,"
including that Plaintiff testified that he drives his children to
school in the morning and back home in the afternoon, shops with
his wife, and attends church twice weekly.  (R. 23-24.)

     Next, the ALJ turned to the medical evidence.  The ALJ
began by recognizing that Plaintiff's right shoulder and left
shoulder anterior labral tear caused functional limitations, but

further reasoned from the record that they did not preclude all work-related activities.   (R. 24.)   The ALJ summarized the examination findings from Plaintiff's treatment at Plainview Hospital, observing that while they revealed limited range of motion and tenderness in his left arm, they revealed no deformity, tenderness, or restriction of movement for his back.   (R. 24.) Further, images of his left shoulder and back showed no fractures or dislocation. (R. 24.)  The ALJ also addressed Plaintiff's early treatment history with Dr. Sharma, in particular her opinion that findings from Plaintiff's 2015 MRI of his left shoulder were "benign."  (R. 24.)  Further, the ALJ noted that, while Plaintiff reported paresthesias in both hands at these 2015 visits to Dr. Sharma, "objectively he had 5/5 strength in his bilateral upper extremities, and was neurologically intact."  (R. 24.)

Continuing, the ALJ considered Plaintiff's treatment records from Dr. Cappellino, noting that Plaintiff denied paresthesias at visits in the fall of 2015.  (R. 24.)  The ALJ observed that Dr. Cappellino recommended right shoulder arthroscopy due to Plaintiff's lack of progress through physical therapy and injections and summarized Dr. Cappellino's findings and diagnosis from Plaintiff's post-operative visits.   (R. 24.) In particular, the ALJ noted that while Plaintiff exhibited limited range of motion in his shoulders and cervical spine at these post-operative visits, "he had normal strength in his wrists, hands,

biceps, and triceps, and normal reflexes in his biceps and triceps." (R. 24.)  The ALJ further considered Plaintiff's second arthroscopy on his left shoulder and the results of shoulder strength tests administered at post-operative visits, which revealed normal deltoid strength, normal internal rotation strength, and diminished external rotation strength bilaterally. (R. 24-25.)

Next, the ALJ considered the medical record as to Plaintiff's cervical radiculopathy, including his 2015 MRI, the findings of which Dr. Sharma opined were "benign," and a 2018 EMG study, the findings of which were described as "mild."  (R. 25.) With respect to Plaintiff's neck and shoulder impairments, the ALJ concluded that the record justified upper extremity restrictions, noting specifically that Plaintiff "reported neck and shoulder pain throughout the medical record and had surgery on both shoulders." (R. 25.)  For that reason, the ALJ's RFC determination limited Plaintiff to occasional, not repetitive, reaching overhead bilaterally, and occasional pushing and pulling with the upper extremities bilaterally.  (R. 25.)  However, the ALJ observed that Plaintiff had normal strength in the biceps, triceps, wrists, and hands at several physical examinations.  (R. 25.)  "Balancing" these findings in the record, the ALJ limited Plaintiff to lifting objects at the sedentary level.  (R. 25.)

The ALJ then discussed Plaintiff's degenerative disc disease, concluding "the evidence failed to support that this impairment was disabling." (R. 25.) To arrive at this conclusion, the ALJ summarized the findings from several MRIs of the lumbar spine and thoracic spine Plaintiff underwent in 2016 and 2018. (R. 25.) The ALJ also considered the findings from Plaintiff's physical examinations before Drs. Cappellino and Sharma. In closing, the ALJ noted that while the record did not support a finding of disability as to Plaintiff's degenerative disc disease, "some limited positive findings on the [Plaintiff's] lumbar MRIs" and the physical examinations that revealed limited range of motion in the lumbar spine justified "limitations for postural activities and climbing," as reflected in the RFC. (R 25.)

Last, the ALJ explicitly disregarded assessments in the record indicating "no work, partial disability of varying degrees, moderate to severe, and 'temporary disability," as these assessments were made under "different standards that are not probative here and are not vocationally specific." (R. 26.)

Turning to step four, the ALJ found Plaintiff was not capable of performing any past relevant work, consistent with the VE's testimony. (R. 26.) Nevertheless, at step five the ALJ concluded that "considering [Plaintiff's] age, education, work experience, and [RFC], [Plaintiff] is capable of making a successful adjustment to other work that exists in significant

numbers in the national economy," such as document preparer, order clerk, or call out operator.  (R. 27.)  Accordingly, the ALJ determined that Plaintiff is not disabled.  (R. 27.)

III. <u>Analysis</u>

Plaintiff advances three arguments on appeal: (1) the Commissioner failed to properly evaluate Plaintiff's allegations and testimony by failing to provide a proper credibility determination (Pl. Br. at 19-21); (2) the Commissioner failed to evaluate the opinion evidence under the treating physician standard outlined in the appropriate regulations (<u>id.</u> at 21-24); and (3) the ALJ failed to properly consider the limiting effects of Plaintiff's bilateral hand limitations (<u>id.</u> at 24-25).  The Court addresses these arguments in turn.

A.   <u>The ALJ's Credibility Assessment</u>

First, Plaintiff takes issue with the ALJ's credibility assessment, arguing that the ALJ "failed to actually evaluate Plaintiff's allegations and testimony pursuant to the necessary two-step credibility process." (Pl. Br. at 21 (emphasis omitted).) Plaintiff focuses on the ALJ's alleged failure to consider other, non-medical evidence, such as Plaintiff's subjective complaints of pain.  (Reply at 6-8.)

"When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account . . . but is not required to accept the claimant's

subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (first citing 20 C.F.R. § 416.929; and McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701, 704-05 (2d Cir. 1980); and then citing Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979)). Social Security regulations outline a two-step process for evaluating symptoms such as pain. See 20 C.F.R. § 416.929. First, the ALJ must determine whether Plaintiff suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. Genier, 606 F.3d at 49 (citing 20 C.F.R. § 416.929(b)). To do so, the ALJ is required to consider Plaintiff's allegations alongside the available medical evidence. See Cichocki v. Astrue, 534 F. App'x 71, 75-76 (2d Cir. 2013).

But while "[o]bjective medical evidence is useful," the ALJ "will not reject statements about the intensity and persistence of pain and other symptoms 'solely because the available objective medical evidence does not substantiate [Plaintiff's] statements.'" Id. at 76 (quoting 20 C.F.R. § 416.929(c)(2)). Rather, at step two, if Plaintiff's testimony regarding his symptoms are not substantiated by the objective medical evidence, the ALJ must consider "other evidence" in the record, such as:

(i)     Plaintiff's daily activities;

(ii)    The location, duration, frequency, and intensity of
        Plaintiff's pain or other symptoms;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of
        any medication Plaintiff takes or has taken to
        alleviate his pain or other symptoms;

(v)     Treatment, other than medication, Plaintiff receives
        or has received for relief of his pain or other
        symptoms;

(vi)    Any measures Plaintiff uses or has used to relieve
        pain or other symptoms; and

(vii)   Other factors concerning Plaintiff's functional
        limitations and restrictions due to pain or other
        symptoms.

Id. (quoting 20 C.F.R. § 416.929(c)(3)).  The ALJ's decision "must

contain specific reasons for the finding on credibility, supported

by the evidence in the case record, and must be sufficiently

specific to make clear to the individual and to any subsequent

reviewers the weight the [ALJ] gave to the individual's statements

and the reasons for that weight."  SSR 96-7p, 1996 WL 374186, at

*2.  Nevertheless, "remand is not required where 'the evidence of

record permits us to glean the rationale of an ALJ's decision.'"

Cichocki, 534 F. App'x at 76 (quoting Mongeur v. Heckler, 722 F.2d

1033, 1040 (2d Cir. 1983)).

        Plaintiff's argument that the ALJ failed to conduct a

proper credibility analysis falls flat, because he fails to

identify any non-medical evidence, such as Plaintiff's testimony,

that the ALJ discredited in arriving at her RFC determination.

See Cillari v. Colvin, No. 13-CV-4154, 2015 WL 1433371, at *20

22

(S.D.N.Y. Mar. 30, 2015) (concluding any issues with the ALJ's credibility assessment were harmless where the ALJ did not discredit any material portions of the plaintiff's testimony).  To the contrary, the Court has reviewed the record in this case and finds the ALJ's RFC is consistent with and supported by both the medical and non-medical evidence.  Plaintiff testified that he could lift twenty pounds with his right hand and ten pounds with his left hand; sedentary work involves lifting no more than 10 pounds at a time.  Plaintiff further testified that he could sit for about twenty minutes before experiencing numbness and stand for twenty to thirty minutes before experiencing neck pain; sedentary work requires only occasional walking and standing. Last, Plaintiff testified he experienced difficulty reaching with his left shoulder; for that reason, the ALJ limited Plaintiff to occasional reaching overhead.  For these reasons, the ALJ could accurately conclude that Plaintiff's allegations and testimony supported her modified sedentary RFC determination.  (R. 26.)

While Plaintiff fails to specify any particular testimonial evidence that the ALJ discredited in formulating her RFC, the Court recognizes that the ALJ's conclusion is in potential conflict with two pieces of testimony: (1) Plaintiff's claim that his arms become tired after more than five minutes of use; and (2) Plaintiff's assertion that he has difficulties using his hands because his fingers get "stuck."  However, it is clear from the

ALJ's decision that she discredited these allegations because they were undermined by the medical record, especially the consistent physical examination findings that revealed Plaintiff had normal strength in his biceps, triceps, wrists, hands, and deltoids. (R. 25.) The ALJ explicitly balanced these findings of normal strength with Plaintiff's neck and shoulder impairments. (R. 25.)

Last, to the extent Plaintiff faults the ALJ for failing to explicitly discuss some of the factors listed in 2020 C.F.R. § 416.929(c)(3), that argument fails because the Second Circuit does not require rote recitation of the factors. Cichocki, 534 F. App'x at 76 ("Because the ALJ thoroughly explained his credibility determination and the record evidence permits us to glean the rationale of the ALJ's decision, the ALJ's failure to discuss [the factors listed in 20 C.F.R. § 416.929(c)(3)] not relevant to his credibility determination does not require remand."); see also Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013) (holding that "no such slavish recitation" of each factor provided for in 20 C.F.R. § 404.1527(c) was required "where the ALJ's reasoning and adherence to the regulation [was] clear"). In any event, the ALJ did in fact address several of the factors, including Plaintiff's testimony regarding how his pain impacted his activities of daily living, the frequency and intensity of his reported pain, and factors that aggravate his symptoms. (R. 23-24.) Thus, "although the ALJ may not have gone through each factor

in the Regulation, it is clear from the ALJ's decision that she properly adhered to the Regulations in making her credibility determination." Martin v. Comm'r of Soc. Sec., No. 15-CV-0239, 2016 WL 11477513, at *10 (N.D.N.Y. July 19, 2016), report and recommendation adopted sub nom. Martin v. Colvin, 2016 WL 4491724 (N.D.N.Y. Aug. 26, 2016). Accordingly, the Court finds that the ALJ explained her credibility assessment with sufficient specificity to enable this reviewing Court to conclude that the RFC determination is supported by substantial evidence. Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260–61 (2d Cir. 1988).

    B.   The ALJ's Evaluation of Dr. Herrera's Opinions

Plaintiff's second ground for remand -- that the ALJ failed to properly evaluate the opinion of Dr. Herrera under the treating physician rule -- fails for similar reasons. To begin, contrary to Plaintiff's assertion that the ALJ "failed to mention" the medical evidence provided by Dr. Herrera, the ALJ considered findings from Dr. Herrera's physical examinations of Plaintiff. (R. 24 (referencing and discussing physical examination findings from Dr. Hererra's treatment notes).) But more significantly, Plaintiff fails to demonstrate that Dr. Herrera's opinions and the ALJ's determination meaningfully diverge, such that, by deferring to Dr. Herrera's opinion, the ALJ would have concluded differently. Dr. Herrera opined that Plaintiff should avoid lifting more than ten pounds; the ALJ limited Plaintiff to sedentary work, which

precludes lifting or carrying more than ten pounds.  Dr. Herrera opined that Plaintiff should avoid overhead activities; the ALJ limited Plaintiff to no more than occasional, non-repetitive, reaching overhead.  And just as Dr. Herrera opined that Plaintiff should avoid prolonged and continuous standing and walking, the ALJ limited Plaintiff to sedentary work, which involves only occasional standing and walking.  See SSR 83-10, 1983 WL 31251, at *6.  While the ALJ did not include further limitations in sitting beyond sedentary work, as Dr. Herrera's early opinions recommend, those restrictions were dropped from later assessments, which contained no sitting restrictions.  Thus, the ALJ's conclusion reflected Plaintiff's longitudinal medical record before Dr. Herrera.  On these facts, Plaintiff cannot show that any further reliance on Dr. Herrera would have altered the ALJ's determination. See Lefever v. Astrue, 443 F. App'x 608, 609 (2d Cir. 2011) (affirming district court decision that assigned error to the ALJ's failure to give controlling weight to treating physician but nevertheless denied remand because the correct assessment of the treating physician's evidence "would not change the outcome of [the plaintiff's] appeal").

    C.   The ALJ's Consideration of Plaintiff's Hand Limitations

Last, Plaintiff argues that the ALJ failed to properly consider the limiting effects of Plaintiff's bilateral hand limitations.  However, as noted supra, the ALJ considered the

physical examinations throughout the medical record that revealed Plaintiff had full strength in his hands and upper extremities. The ALJ also considered Plaintiff's testimony that he could lift twenty pounds with his right hand and ten pounds with his left hand, as well as his testimony that he could use his hands to drive.  Put otherwise, the ALJ's conclusion that no further hand limitations were warranted is supported by substantial evidence in the record, even if an alternative conclusion is supported as well. Valente v. Sec'y of Health & Hum. Servs., 733 F.2d 1037, 1041 (2d Cir. 1984) ("The court may not substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon a de novo review.").

CONCLUSION

For the foregoing reasons, Plaintiff's motion (ECF No. 13) is DENIED as stated herein, and the Commissioner's motion (ECF No. 15) is GRANTED.

The Clerk of the Court is directed to enter judgment accordingly and mark this case CLOSED.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:      January   21  , 2022
            Central Islip, New York